PEOPLE *v*. TRZIL.

1. CRIMINAL LAW—STATUTORY RAPE—EVIDENCE OF INTIMATE RE-
LATIONS OF PARTIES ADMISSIBLE.

In a prosecution for statutory rape, testimony that wit-
ness saw defendant and prosecutrix lying together on
a bed was admissible, not for the purpose of showing the
commission of another offense, but for the purpose of
showing the disposition of the parties, and intimate re-
lations of a nature tending to break down self-respect and
modesty.[1]

2. SAME—TRIAL—INSTRUCTIONS TO SCRUTINIZE EVIDENCE IN REGARD
TO DEFENSE OF ALIBI NOT ERROR.

In a prosecution for statutory rape, where the defense
was an *alibi*, it was not error for the court to instruct
the jury that an *alibi* is a defense easy to prove and
hard to disprove, and therefore they should be careful
and cautious in examining the evidence in regard to an
*alibi*.[2]

Error to recorder's court of Detroit; Stein (Christo-
pher E.), J.     Submitted June 17, 1926.     (Docket
No. 118.)     Decided July 1, 1926.

Joseph Trzil was convicted of statutory rape, and
sentenced to imprisonment for not less than 5 nor more
than 15 years in the State prison at Jackson. Af-
firmed.

*Edward N. Barnard,* for appellant.

*Andrew B. Dougherty,* Attorney General, *Robert M.
Toms,* Prosecuting Attorney, and *Seward F. Nichols,*
Assistant Prosecuting Attorney, for the people.

STEERE, J.     Defendant was convicted in the re-
corder's court of the city of Detroit of the crime of

[1]Rape, 33 Cyc. p. 1483; [2]Criminal Law, 16 C. J. § 2379.
On instructions disparaging defense of *alibi*, see note in 14
A. L. R. 1426.

statutory rape committed, June 2, 1924, upon Veronica Bonaszak, a girl 14 years of age.    The defense was an absolute denial with a claim of *alibi*.    Frank Bonaszak, father of the girl, was a plumber residing in Detroit with his wife and three minor children. Defendant was a young man about 23 years of age working for the Ford Motor Company.    He became acquainted with the Bonaszak family when called as a witness in a negligence case brought to recover damages for injuries sustained by Veronica when struck on the street by an automobile.    The father invited him to their home with manifestations of friendship and he became an occasional visitor there. Veronica's mother was in poor health and died not long thereafter.    Following her mother's death, he became a frequent caller at the home and noticeably attentive to Veronica.    She testified to their intimacy resulting in improper relations induced by his manifestations of affection and promise to marry her after her father married again, as he was planning to do and soon did; that he came to their home on June 2, 1924, between 9 and 10 o'clock in the morning, and while there had sexual intercourse with her.    This he denied, claiming that at the time the offense is charged he was at his own room in bed.    Shortly after this time Veronica went to Buffalo, where she had relatives, without the knowledge or consent of her father and defendant took her to the train.    She had had some trouble with her father and testified she had in mind to go to her aunt in Buffalo "because I was afraid my father might find out I had something to do with Joe (Trzil)."    She was sent back from Buffalo by an uncle.    After her return to Detroit she was taken to the detention home, apparently at the instance of her father, where she was given a physical examination by a female physician of the police department, at which time, as she testified, "I told about my relations

with Joe. That was the first time that I had ever told any one."

Complaint was made against defendant under the statute, and after his arrest an interview was had with him by two women of the police force in the presence of Veronica. One of the women, who was a member of the police force in the women's division and assigned to look after this case, testified that in the interview he admitted having sexual intercourse with Veronica and gave as his excuse that he intended to marry her but her father would not permit it. This he denied upon the witness stand, saying:

"I didn't admit having intercourse with Veronica, not exactly, I just said I wanted to get a lawyer for the case. I didn't give any particular answer up there."

He did admit his friendly association with Veronica, denying, however, that he ever had improper relations with her, and said:

"I didn't keep steady company with Veronica, just now and then. Sometimes I would see her pretty often, and sometimes I would just see her when she wanted me to go somewhere for her."

He also testified that he was married on October 4, 1924, to one Florence Craig whom he had known for about two years.

His story of the events bearing upon the day on which the offense was said to have been committed is that in the plant where he worked he checked in at about 3 o'clock of the day before and left shortly before 12 that night; that he habitually went to bed about 1 o'clock, arising about 10, and on that day he arose at about 10 in the morning and was eating his breakfast when he received a telephone call from Veronica and went over to her home about 11 o'clock, where she told him she was having trouble with her father and was going to Buffalo to visit an aunt. He

had an automobile and drove her over to the train and then went home again.

A younger sister of Veronica, named Bernice, testified to defendant's frequent visits at their home when her mother was sick and after she died and to acts of familiarity between Veronica and defendant. She was permitted, against objection, to testify that she had seen them in a room at their home lying together on a bed, saying:

"When I saw Joe and my sister in bed, she was laying in bed with him; she came and gave me coffee, I was home at recess, so I saw them; she came out to give me coffee so when I ate I went. * * * I don't remember * * * what day that was last year. I think it was June 2d; I don't remember. * * * I went to school last June.   Saint Andrew's.   Recess started at 15 to 10, and ended at 15 after 10."

After listening to the conflicting testimony of the respective parties and their witnesses the jury found defendant guilty under a fair and impartial charge of the court fully instructing them as to their duties and the safeguards which the law throws around an accused.

The two questions which are raised and urged in defendant's brief are whether or not the court erred in receiving over objection the testimony of Bernice Bonaszak and a charge of the court concerning defendant's claim of *alibi*.

As to this testimony, it is argued for the defense that Bernice was permitted to narrate the story of the commission of another offense without being able to tell when it happened, whether before or after the one charged; that she was uncertain as to the time and her testimony was highly prejudicial, leaving the result speculative with the jury.   The girl did not testify to the commission of any other offense but only to familiar and unconventional conduct, saying in part

that both were properly dressed when she came upon them and defendant's pants were not unbuttoned. This is a case involving illicit sexual relations where proof of consent is no defense, the child assaulted being under the statutory age and legally incapable of consent. This court said in *People* v. *Gengels,* 218 Mich. 632:

"In cases involving statutory rape, a qualified exception to the general rule only permits proof of intercourse between the prosecutrix and accused for the purpose of showing opportunity, disposition of the parties and intimate relations tending to break down self-respect and modesty;" citing numerous decisions.

So far as surrounding circumstances and Bernice's testimony tend to show, the time when she saw the specific act of impropriety indicate it was before and not after the time of the offense charged, and as she saw it, it went no further than to show the disposition of the parties and intimate relations of a nature tending to break down self-respect and modesty. The only objection to this testimony was that it be "stricken out as immaterial, as it does not relate to June 2, 1924." We find no reversible error in its admission.

As to the portion of the charge of the court relative to *alibi,* the court fully explained to the jury its meaning, and said:

"The defense of an *alibi* is as legitimate a defense as any other defense and you are to give the same credit to the witnesses who testify concerning it as you do to the witnesses who testify to anything else. If you have a reasonable doubt as to whether the defendant was there at the time and place named, then you should acquit him. The burden of proof is upon the State to show that he was there at the time and place in question—the burden of proof does not shift to the defendant. That is the law, as I understand it regarding an *alibi.* But, gentlemen of the jury, you are to scrutinize any evidence in relation to it, as an *alibi* is a defense easy to prove and hard to dis-

prove, therefore, you should be careful and cautious in examining the evidence in regard to an *alibi*."

Language of similar import was sustained in *People* v. *Resh*, 107 Mich. 251, and *People* v. *Tice*, 115 Mich. 219 (69 Am. St. Rep. 560). And in the later case of *People* v. *Portenga*, 134 Mich. 247, this court said:

"It is insisted that the court erred in telling the jury to 'scrutinize any evidence in relation to the *alibi*. An *alibi* is a defense that is easily proven, and hard to disprove; therefore, you will be careful and cautious in examining the evidence bearing upon the question of *alibi*.' This language did not instruct the jury to discredit the defendant's testimony, nor did it indicate to them that they should be controlled by any supposed view entertained by the court. It simply cautioned the jury to carefully examine that testimony."

On examination of the annotations to *State* v. *Danelly*, in 14 A. L. R. 1420 (116 S. C. 113, 107 S. E. 149), citing, among other cases, the *Portenga Case*, it will be found that the great weight of authority in other jurisdictions is contrary to the defendant's contention that such instructions are erroneous.

Judgment will stand affirmed.

Bird, C. J., and Sharpe, Snow, Fellows, Wiest, Clark, and McDonald, JJ., concurred.